SEALED BY ORDER
OF THE COURT

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

FILED

JAN 26 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF COURT
SAN JOSE, CALIFORNIA

| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Ramon Covarrubias Rangel, Jorge Lozano Guzman, and Alejandro Alvarez, | ) | |
| | ) | |
| | ) | |

CR 21 70143 MAG

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   Dec. 10, 2019, to Feb. 27, 2020   in the county of   Santa Clara   in the

Northern   District of   California   , the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C.  §§ 846, 841(a)(1), 841 (b)(1)(A)(viii) | Conspiracy to distribute and possess with intent to distribute cocaine and 500 grams and more of a mixture and substance containing methamphetamine |
| | Penalties:  Minimum 10 years imprisonment, maximum life imprisonment; supervised release term of a minimum 5 years, maximum life; $10,000,000 fine; and $100 special assessment |

This criminal complaint is based on these facts:

See affidavit of DEA Special Agent Jonathan Kim, attached hereto and incorporated by reference

☑ Continued on the attached sheet.

Approved as to form  *Sarah C. Griswold*
AUSA Sarah Griswold

/s/ Jonathan Kim
*Complainant's signature*

Jonathan Kim, Special Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   January 25, 2021

*Judge's signature*

City and state:   San Jose, CA

Nathanael M. Cousins, U.S. Magistrate Judge
*Printed name and title*

Print     Save As...     Attach     Reset

662

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jonathan Kim, hereby duly sworn, declare and state:

## INTRODUCTION

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I make this affidavit in support of a Criminal Complaint charging **Ramon Covarrubias Rangel, Jorge Lozano Guzman,** and **Alejandro Alvarez** each with conspiracy to distribute and possess with intent to distribute cocaine and 500 grams and more of a mixture and substance containing methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(viii).

3.      The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. In addition, where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

4.      Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause for a criminal complaint.

## AGENT BACKGROUND

5.      I am a Special Agent of the Drug Enforcement Administration (DEA) currently assigned to the DEA San Jose Resident Office. As a Special Agent with the DEA, my investigations focus on large-scale narcotics offenders. Prior to becoming a Special Agent with the DEA, I worked for two years as a cancer research support associate at the Massachusetts Institute of Technology (MIT). I began my tenure with the DEA in December 2018. Prior to being assigned to the San Jose Resident Office, I received 16 weeks of specialized training at the DEA Academy in Quantico, Virginia. This training included several hundred hours of comprehensive, formalized instruction in, among other things, basic narcotics investigations, drug identification, detection, interdiction, United States narcotic laws, financial investigations and money laundering, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures.

6.      I have participated in numerous narcotics and financial investigations either as the case agent or in a supporting role. I have executed and assisted in the execution of numerous federal and state search warrants that resulted in the arrest of suspects and the seizure of money

1

and narcotics.  I have also interviewed drug dealers, users, and confidential sources, and have discussed with them the lifestyle, appearances, and habits of drug dealers and users, the use and meaning of coded language, and the concealment of assets.  I have also participated in other aspects of narcotics investigations including, but not limited to, undercover operations, conducting physical and electronic surveillance, controlled deliveries, execution of warrants, and arrests.  I have monitored meetings and consensual telephone conversations between drug dealers, confidential sources and undercover agents and have participated in physical surveillance of narcotics traffickers.  During these surveillances, I have personally observed narcotics transactions, counter-surveillance techniques and the methods that narcotics traffickers use to conduct clandestine meetings.

7.     As a result of my training and experience, I am familiar with how various drugs, including crystal methamphetamine and cocaine, are used and the typical distribution and trafficking methods used by drug dealers and traffickers.  I am also familiar with the various methods generally used by traffickers to transport drugs in and through the state of California.

8.     I have also had discussions with other law enforcement officers and cooperating individuals about the packaging and preparation of narcotics, methods of operation, and security measures which are often employed by narcotics traffickers.

9.     I am familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, coded or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations, in part due to other agents' experience and my involvement in past wiretap investigations.

## APPLICABLE LAW

10.     Title 21, United States Code, Section 846 makes it unlawful to knowingly conspire to distribute and possess with intent to distribute controlled substances, including cocaine and methamphetamine.  Cocaine and methamphetamine are Schedule II controlled substances.

## STATEMENT OF PROBABLE CAUSE

11.     As discussed below, the DEA, Homeland Security Investigations (HSI), and Federal Bureau of Investigations (FBI) (collectively "the Investigative Agencies") have been conducting an investigation into the drug trafficking activities of Covarrubias, Lozano, Alvarez, and others in the Northern District of California.  The Investigative Agencies used a confidential

source (CS-1)[1] to introduce a second confidential source (CS-2)[2] to Covarrubias. The Investigative Agencies used CS-2 to conduct controlled purchases of controlled substances from Covarrubias, Lozano, and Alvarez.

### December 18, 2019: Controlled Purchase of Methamphetamine and Cocaine

11.     On December 10, 2019, at the direction of agents, CS-1 used a non-recorded telephone number to call Covarrubias. According to CS-1, CS-1 provided Covarrubias with CS-2's monitored and recorded telephone number and told Covarrubias that CS-2 wanted to buy narcotics from Covarrubias. According to CS-1, Covarrubias agreed to sell narcotics to CS-2 and said that one of Covarrubias' associates would contact CS-2. Later that same day, Lozano called CS-2 and introduced himself.[3]

12.     On December 17, 2019, CS-2 called Lozano and arranged a purchase of methamphetamine and cocaine for the following day.

13.     On December 18, 2019, CS-2 and Lozano met in a parking lot in San Jose, California. Surveillance agents saw Lozano enter the front-passenger seat of CS-2's vehicle while carrying a red and white shopping bag. The video recording equipment in CS-2's vehicle showed Lozano greeting CS-2. Lozano gave CS-2 a small, clear bag containing approximately

---

[1] CS-1 began assisting agents in this investigation in November 2019. CS-1's knowledge of Covarrubias and his associates stemmed from CS-1 having previously conducted narcotics transactions with Covarrubias and an associate of Covarrubias' prior to CS-1's cooperation with federal law enforcement agencies. CS-1 has provided information on the targets of this investigation that has been corroborated by agents and has been reliable. CS-1 has been previously convicted of a felony for possession for sale of a controlled substance. CS-1 is cooperating with law enforcement for monetary gain as well as immigration benefits. DEA and HSI agents have paid CS-1 $4,350 for CS-1's assistance in this investigation. Agents believe CS-1 has spoken to Covarrubias outside the direction of agents.

[2] CS-2 has participated in several federal investigations. Agents have deemed CS-2 to be reliable and have been able to independently corroborate CS-2's information. CS-2 commenced assisting agents with this investigation in December 2019. In prior investigations, CS-2 has conducted controlled purchases of narcotics, which have subsequently led to arrests and narcotics seizures. During this investigation, CS-2's calls and meetings were monitored and recorded. CS-2 has conducted multiple narcotics purchases in the furtherance of this instant investigation. CS-2 has two felony narcotics trafficking convictions, a misdemeanor possession of narcotics conviction, and two misdemeanor driving under the influence convictions. CS-2 is currently working for monetary gain and has received more than $200,000 in compensation since the beginning of CS-2's tenure with DEA in 1999.

[3] All calls and text messages described between CS-2 and Lozano were consensually recorded and monitored using an investigative technology. This technology allows agents to independently verify what telephone numbers called and texted CS-2, and what telephone numbers CS-2 called and texted. I subsequently reviewed the telephone records and confirmed all calls and texts between CS-2 and Lozano did occur. Furthermore, I confirmed all the calls described below by reviewing Lozano's tolls. All communications between CS-2 and Lozano were in Spanish. Summaries and/or translations of the calls and texts were provided to me by Spanish-speaking agents and/or Spanish linguists.

one ounce of cocaine, and a clear bag containing approximately one kilogram of methamphetamine. During the meeting, Lozano explained to CS-2 that an ounce, or "28," was called a "bottle," a "14" or a half ounce was called a "beer," a kilogram was a "torta," and a half kilogram was a "burrito." CS-2 gave Lozano $3,000 in Official Advance Funds (OAF) for the kilogram of methamphetamine and $860 in OAF for the ounce of cocaine.[4] Lozano returned $10 as change and got out of CS-2's vehicle.

### February 26, 2020: Controlled Purchase of Methamphetamine

14. On February 7, 2020, CS-1 provided to agents a new telephone number for Covarrubias. On February 25, 2020, HSI SA Gricelda Garcia used CS-1's monitored and recorded telephone number to text Covarrubias at the new phone number[5] at approximately 12:31 p.m., asking Covarrubias to contact CS-2. Toll records show that at approximately 12:33 p.m., Covarrubias called Lozano six times from that same number.

15. At approximately 12:41 p.m., Lozano called CS-2 from the same number Covarrubias had just called six times. During this conversation, Lozano told CS-2 that "they" told Lozano to get in contact with CS-2, and if CS-2 told Lozano the time, Lozano would call Lozano's "buddy" to come by. Lozano described a kilogram of methamphetamine as a "tortita," and gave a price of $2,700 per kilogram of methamphetamine. Lozano said that he was sending a courier to deliver the methamphetamine, and that Lozano would contact CS-2 from a different number. Shortly thereafter, Lozano contacted CS-2 from a separate telephone number.

16. Based on my training, experience, and conversations with other agents, and the context of the calls, I believe that Lozano was referring to Covarrubias when he said to CS-2 that "they told me to call you."

17. Later that day, as directed by agents, CS-1 used a monitored and recorded telephone number to call Covarrubias. During this conversation, CS-1 asked Covarrubias if "they" called CS-1's friend (CS-2). Covarrubias confirmed and said "the dude called him and everything is good there."[6] Based on my training, experience, and conversations with other

---

[4] The cocaine and methamphetamine were tested by Western Regional Laboratory, which returned results for 28.5 +/- 0.2 grams of cocaine hydrochloride (55% +/- 5% purity), and 964.2 +/- 0.2 grams of methamphetamine hydrochloride (98% +/- 6% purity).

[5] All calls and text messages described below between CS-1 and Covarrubias were consensually recorded and monitored using an investigative technology. This technology allows agents to independently verify what numbers called and texted CS-1, and what telephone numbers CS-1 called and texted. I subsequently reviewed the telephone records and confirmed all calls and texts between CS-1 and Covarrubias did occur. Furthermore, I confirmed all the calls described below by reviewing Covarrubias' tolls. All communications between CS-1 and Covarrubias were in Spanish. Summaries and/or translations of the calls and texts were provided to me by HSI SA Gricelda Garcia, who is a native Spanish speaker and is familiar with this investigation.

[6] All monitored and recorded communications between CS-1 and Covarrubias described

4

agents, I believe that during this conversation between CS-1 and Covarrubias, CS-1 asked if Covarrubias' courier, Lozano ("they") called CS-2. Covarrubias confirmed that Lozano ("the dude") did call and that Lozano and CS-2 had coordinated the purchase of methamphetamine ("everything is good there").

18.   On February 26, 2020, CS-2 called Lozano and confirmed the time and location of the meeting place. Lozano said that he was sending a friend who is "chubby" who would arrive in a gold Honda.

19.   The February 26, 2020, meeting occurred in a parking lot in San Jose, California. At approximately 1:39 p.m., surveillance agents saw a gold Honda Accord enter the parking lot and park next to CS-2's vehicle. Agents saw Alejandro Alvarez get out of the gold Accord. The video recording equipment showed Alvarez hand CS-2 a box that contained approximately one kilogram of methamphetamine through the open passenger side window.[7] Alvarez then entered CS-2's vehicle, CS-2 gave Alvarez $2,700 in OAF, and Alvarez the got out of CS-2's vehicle.

20.   After the deal, agents saw Alvarez enter the gold Accord, drive to another parking lot across the street, and meet with Lozano. At that time, Lozano called CS-2, and asked CS-2 to go to the parking lot across the street to talk in person while waving in CS-2's direction. CS-2 declined and left the parking lot.

21.   On February 27, 2020, at approximately 7:52 p.m., CS-1 used a monitored and recorded telephone number to call Covarrubias. During this conversation, CS-1 asked, "Did they take care of my buddy?" Covarrubias responded, "I think so," and explained, "I'm going to ask the dude, since I don't talk to him much to…until the weekend when I see him because, you know…I'm going to ask him what's the move. But I think everything is good."

22.   Based on my training, experience, and conversations with other agents, I believe that during this conversation, CS-1 asked if Covarrubias' courier delivered drugs to CS-2 ("Did they take care of my buddy?"). Covarrubias responded that Covarrubias thinks the courier delivered drugs to CS-2. Covarrubias further said Covarrubias would ask the courier to confirm and explained that Covarrubias does not communicate with the courier over the telephone.

/ / /

/ / /

/ / /

/ / /

_____

below were in Spanish and were examined, translated, and summarized by HSI SA Garcia.

[7] The methamphetamine was tested by the Western Regional Laboratory, which returned results for 990.7 +/0 0.2 grams of methamphetamine hydrochloride (100% +/- 6% purity).

## CONCLUSION

23.     Based on the foregoing, I hereby assert that probable cause exists to believe that **Ramon Covarrubias Rangel, Jorge Lozano Guzman,** and **Alejandro Alvarez** violated 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(viii).

/s/ Jonathan Y. Kim
_____

JONATHAN Y. KIM
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 25th day of January 2021.  This complaint and warrants are to be filed under seal.

THE HONORABLE NATHANAEL M. COUSINS
United States Magistrate Judge

6